110 T.C. No. 27


UNITED STATES TAX COURT


PNC BANCORP, INC., SUCCESSOR TO FIRST NATIONAL
PENNSYLVANIA CORPORATION, ET AL.,[1] Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket Nos. 16002-95, 16003-95,        Filed June 8, 1998.
            16109-96, 16110-96.


As a result of mergers, P succeeded to the interests of two banks. During the years in issue, the banks' primary source of revenue was interest charged on loans. In the process of making loans, the banks incurred costs for property reports, credit reports, appraisals, recording security interests, and salaries and benefits to bank employees. The lives of the loans extended beyond the year in which the expenditures were incurred. For financial accounting purposes, loan origination expenditures related to completed loans were capitalized and amortized over the life of the loans. For Federal tax purposes, these expenditures were deducted in the year incurred. P argues that,

---

[1]The following cases are consolidated: PNC Bancorp, Inc., Transferee of Assets of First National Pennsylvania Corporation, docket No. 16003-95; PNC Bancorp, Inc., Successor to United Federal Bancorp, Inc., and Subsidiaries, docket No. 16109-96; and PNC Bancorp, Inc., Transferee of Assets of United Federal Bancorp, Inc., and Subsidiaries, docket No. 16110-96.

because the expenditures are both recurring and integral to the business of the banks, they are currently deductible under sec. 162(a), I.R.C.

Held:  The loan origination expenditures were incurred in the creation of loans.  These loans were separate and distinct assets that generated revenue over a period beyond the current taxable year.  The expenditures are not currently deductible under sec. 162(a), I.R.C., and must be capitalized under sec. 263(a), I.R.C.

Robert J. Jones, Thomas R. Dwyer, and Anthony J. O'Donnell, for petitioner.[2]

John A. Guarnieri, David B. Silber, and Richard H. Gannon, for respondent.

RUWE, Judge:  These consolidated cases involve deficiencies determined by respondent as follows:

First National Pennsylvania Corp.
docket Nos. 16002-95 and 16003-95

| Year | Deficiency |
|------|-----------|
| 1988 | $101,785 |
| 1990 | 978 |

United Federal Bancorp, Inc.
docket Nos. 16109-96 and 16110-96

| Year | Deficiency |
|------|-----------|
| 1990 | $7,863 |
| 1991 | 10,236 |
| 1992 | 18,885 |
| 1993 | 7,659 |

---

[2]Brief amicus curiae was filed for the American Bankers Association.

The sole issue for decision is whether loan origination expenditures were ordinary and necessary business expenses properly deductible under section 162(a)[3] or whether they are required to be capitalized under section 263.

## FINDINGS OF FACT

Some of the facts have been stipulated and are incorporated herein by this reference.

During the years in issue, First National Pennsylvania Corp. (FNPC) was a corporation organized under the laws of Pennsylvania and was the owner of all the stock of the First National Bank of Pennsylvania (FNBP), East Bay Mortgage Co., and other corporations which joined with FNPC in the filing of consolidated Federal corporation income tax returns (Forms 1120) (the FNPC Group). The Forms 1120 of the FNPC Group for the calendar years 1988, 1989, and 1990 were prepared using the accrual method of accounting.

During the years 1990 through 1993, United Federal Bancorp, Inc. (UFB) was a corporation organized under the laws of Pennsylvania and was the owner of all the stock of the United Federal Savings Bank (UFSB) and other corporations which joined with UFB in the filing of Forms 1120 (the UFB Group). The Forms

---

[3]Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the taxable years in issue, and all Rule references are to the Tax Court Rules on Practice and Procedure.

1120 of the UFB Group for the calendar years 1990 through 1994 were prepared using the accrual method of accounting.

At all times material, FNBP and UFSB were Federally chartered banks that were actively engaged in the banking business.

Petitioner is a bank holding company organized as a corporation under the laws of Delaware. Petitioner's principal place of business was located in Delaware at the time it filed the petitions in these cases.[4] On or about July 23, 1992, FNPC was merged into petitioner. On or about January 21, 1994, UFB was merged into petitioner. By virtue of these mergers, petitioner succeeded by operation of law to the assets and liabilities of FNPC and UFB. Petitioner is a transferee at law of assets of FNPC and UFB and as such would be liable under section 6901 for any deficiencies in Federal income tax determined to be owing by FNPC and UFB for the years at issue.

The principal businesses of FNBP and UFSB (collectively referred to as the banks) consisted of accepting demand and time deposits and using the amounts deposited, together with other

---

[4]The petitions filed in docket Nos. 16002-95 and 16003-95 were filed by petitioner in response to a notice of deficiency (in the case of docket No. 16002-95) and a notice of liability (in the case of docket No. 16003-95) sent to petitioner in its respective capacities as successor in interest to First National Pennsylvania Corp. (FNPC) and as transferee of assets of FNPC. The petitions filed in docket Nos. 16109-96 and 16110-96 were filed by petitioner in response to a notice of deficiency (in the case of docket No. 16109-96) and a notice of liability (in the case of docket No. 16110-96) sent to petitioner in its respective capacities as successor in interest to United Federal Bancorp, Inc. and Subs. (UFB) and as transferee of assets of UFB.

funds, to make loans. These loans included consumer and commercial term loans and letters of credit, as well as residential and commercial mortgage loans. The banks also provided services and products to customers in addition to the loans. For consumer customers these services and products included checking accounts, savings accounts, money market accounts, safe deposit boxes, automated teller machine (ATM) cards, overdraft insurance, credit protection insurance, certified checks, wire transfers, and traveler's checks. For commercial customers these services and products included, deposit products, treasury management services, investment services, employee benefit plan services, and commercial night drop services.

At all times material, loan interest was the largest source of revenue, and interest on deposits and other borrowings was the largest expense for each bank. Each bank also derived revenues and incurred expenses with respect to safe deposit boxes, ATM cards, late payments on loans, wire transfers, and traveler's checks.

Branches operated by the banks had what are commonly referred to as "teller operations" and "platform operations". The teller operation at a branch consisted of teller windows staffed by tellers who, among other tasks, accepted deposits, disbursed cash, and sold cashier's checks, traveler's checks, and money orders. Tellers referred customers who were interested in other bank products, such as loan and deposit products, to

platform operation employees. The platform operation at a branch was conducted by customer service representatives, branch managers and assistant branch managers, each of whom was assigned a desk on the floor or "platform" of the branch on the customer's side of the tellers' windows. These platform employees were generally responsible for assisting customers in applying for consumer loans, renting safe deposit boxes, obtaining ATM cards, opening checking accounts, and opening new deposit accounts (including time deposits such as certificates of deposit). Each of the banks also had commercial loan officers who were responsible for the commercial products offered by the respective institutions, including loan products, cash management and deposit products, and employee benefit services.

The banks drew their business from their respective geographic service areas through a combination of walk-in business, referrals, prior relationships with customers, advertising, and the direct, active, and personal solicitation of new and existing customers through telephone calls, letters, and other means. Tellers and platform employees of the banks were encouraged to solicit new business, with an emphasis on encouraging the customer to look to the banks for a wide variety of financial services and products. Each of the banks offered financial incentives to certain of its platform employees and tellers to sell multiple products and services (cross-sell incentives). The banks conducted training programs for employees, including classes dealing with lending and the

development of skills in selling loans and other products.  UFSB

employed a sales training officer who met with UFSB platform

employees monthly to promote the sale of new UFSB products and

services.

Banks generally are able to earn profits only if they

successfully manage their "net interest margin", which is the

difference between interest earned and interest paid.  In order

for banks to operate profitably, their net interest margin plus

revenues from fees and other sources must exceed their losses on

loans and investments (i.e., losses from bad debts) plus

operating costs.  A bank's ability to operate profitably is in

large part determined by its credit risk management, since loan

losses are one of the largest controllable expenses at a bank.

Many of the activities that are part of a bank's lending function

are related to credit risk management.  These activities include

the establishment of written policies and procedures, the loan

application process, credit investigation, credit evaluation,

documentation, collections, and portfolio supervision.  A bank

establishes its written policies and procedures with respect to

loans after it has determined the types of loans that it will

offer and the markets that it will target.[5]  Once the loan

products are identified, the bank develops written policies

---

[5]During the years in issue, the banks offered various kinds of loans and loan commitments to their existing and prospective customers at varying rates of interest and for varying periods of time.  Some loans were offered at fixed rates of interest and others at variable rates of interest.

regarding its tolerance for risk, how and under what terms loans are to be made, pricing and profit objectives, documentation requirements, acceptable levels of credit losses, and collection and chargeoff procedures. The risk management process requires continuous adjustment and refinement to address the competing interests of marketing loans to as many customers as possible while at the same time insuring that the bank makes low risk loans.

Consumer Loans[6]

Platform employees at the banks typically met with prospective consumer borrowers to explain available loan products and to assist the prospective borrowers in completing a loan application where appropriate. The consumer loan applications were generally taken by branch employees. The application identified the prospective borrower and described the prospective borrower's income and assets, existing debt, the purpose of the loan, and other data necessary to evaluate the prospective borrower's financial condition. Where loans were to be secured by an interest in real property, the application would also include a description of the collateral sufficient to permit the ordering of a property report or appraisal.

The application process is the primary means by which banks obtain information from consumer customers. The banks took a

---

[6]Both the FNPC cases and the UFB cases involve expenditures relating to consumer loans.

loan application for every consumer loan request. At UFSB, approximately 325 to 350 consumer loan applications were taken in a typical month of which approximately 200 to 220 were approved. At the main central branch of FNBP and its two satellite offices, approximately 90 to 100 consumer loan applications were taken in a typical month of which approximately 80 to 90 were approved.

Following completion of the application, the banks obtained a credit report on the prospective borrower. Where a loan was to be secured by real property, the banks typically obtained a property report to identify any liens or other encumbrances. If the result of the property report was satisfactory, an appraisal of the property was typically obtained.

In evaluating whether to make a consumer loan, the banks would consider certain financial ratios as well as other criteria set forth in their established loan policies. The ratios that were examined included debt to income and, where the loan was to be secured with collateral, loan to value. In addition to examination of the various financial ratios, the banks often looked at a loan applicant's payment history and financial stability.

Where the consumer loan application was denied, the responsible platform employee would discuss the reasons for credit denial with the prospective borrower and encourage the prospective borrower to apply again in the future. In

appropriate instances, the applicant would be offered a smaller loan or a loan on different terms.[7]

Applications for consumer loans that were approved were generally closed in the branch where the loan application was taken. Closing included, among other things, the prospective borrower's execution of a note or other evidence of indebtedness, the prospective borrower's execution of a security agreement or other document conveying a security interest in collateral where appropriate, the delivery of those documents to the banks and, on the part of the banks, some act making the loan proceeds available or, in the case of a new line of credit, some act memorializing the banks' agreements to disburse funds on demand. The banks recorded the documents necessary to perfect a security interest in collateral where appropriate.

The prospective borrower could decide not to enter into a loan transaction at any time prior to closing. Similarly, the banks could decide not to enter into a loan transaction at any time prior to closing, except where they had entered into a loan commitment with the prospective borrower. The banks generally did not charge fees in connection with consumer loans because of competitive factors.[8]

---

[7]In some instances, credit was approved in an amount greater than that sought in the application, and the appropriate platform employee was encouraged to "upsell" the loan to the prospective borrower.

[8]The term "fees" refers to amounts paid by the borrower in connection with the loan origination process. The term "costs" refers to expenses incurred by the banks.

Commercial Loans

Respondent disallowed deductions related to the origination of commercial loans made by FNBP.  No adjustments for commercial loan origination costs were made with respect to UFSB.[9]

FNBP employees with responsibility for commercial products and services met with prospective commercial borrowers to explain the available loan products.  Where the prospective borrower wished to apply for a loan, the responsible employee obtained information needed to complete a loan application.  FNBP employed as many as nine commercial loan officers to handle its larger business customers and to develop new commercial business.  Some FNBP branch managers also acted as commercial loan officers.  Commercial loan officers at FNBP typically had 25 to 30 clients and spent approximately 85 percent of their time dealing with existing clients and about 15 percent of their time with prospective clients.  FNBP commercial loan officers visited existing clients on a quarterly basis at which time they discussed, among other things, the client's financial statements and overall financial condition.

Commercial loan applications identified the prospective borrower and described the prospective borrower's income, assets, and liabilities; the purpose of the loan; and other data

---

[9]There is no explanation for this, and the parties do not base any of their arguments on this disparity.

necessary to evaluate the prospective borrower's financial condition.  Where loans were to be secured by an interest in real property, the application would include a description of the collateral sufficient to permit the ordering of a property report or appraisal.  FNBP would generally obtain 3 years of financial statements, interim financial statements, aging reports to determine the current status of accounts receivable and payable, and secured transaction reports to determine whether any liens had been filed against the property of the client.  Applicants also typically submitted personal financial statements of guarantors, operating projections, a business plan, organizational documents, and certificates of good standing and references.  Information obtained in connection with a commercial loan request was used to evaluate the creditworthiness of the client and to identify other needs of the client that might be met by the bank such as investment services, treasury management services, and employee benefit services.

As a general rule, evaluation of a commercial loan application required FNBP to obtain more information and to expend more resources than was required in the case of a consumer loan application.  In a typical month, each of the nine commercial loan officers at FNBP took between 2 and 10 commercial loan requests.  With respect to commercial loans, it was common for FNBP and the prospective borrower to negotiate the loan terms.

13

In evaluating whether to make a commercial loan, FNBP would consider factors similar to those considered in evaluating consumer loans. FNBP examined payment capacity, including debt-to-income ratios, payment history, financial stability, and, where appropriate, issues relating to collateral including loan-to-value ratios. Financial stability for commercial borrowers involves an examination of sales, earnings, and management.

Commercial loans were closed at various locations including FNBP's offices, the prospective borrower's place of business, or an attorney's office.[10] Closing included, among other things, the borrower's execution of a note or other evidence of indebtedness, execution of a document conveying a security interest in collateral, delivery of those documents to FNBP and, on the part of FNBP, some act making the loan proceeds available or, in the case of a new line of credit, some act memorializing FNBP's agreement to disburse funds on demand. The closing of some commercial loans was handled by FNBP employees, and others were handled by outside legal counsel. If the closing were handled by FNBP employees, closing documents would be prepared and recorded by those employees. If the closing were handled by outside counsel, the outside counsel would prepare and record closing documents. The recording of security interests in

---

[10]When the loan application was denied, the employee dealing with the prospective commercial borrower would discuss the reasons for credit denial with the prospective borrower and encourage the prospective borrower to apply again in the future. In appropriate instances, the applicant would be offered a smaller loan or a loan on different terms.

connection with commercial loans was an event which occurred regularly at FNBP.

FNBP charged fees with respect to some commercial real estate loans but did not charge fees with respect to other commercial loans because of competitive pressures.

Computation of Respondent's Adjustments

Respondent disallowed deductions for certain costs that the banks had identified as costs incurred in connection with the origination of loans. For financial accounting purposes, the banks had deferred these costs over the expected life of the subject loans in a manner consistent with the Statement of Financial Accounting Standards No. 91, "Accounting for Nonrefundable Fees and Costs Associated with Originating or Acquiring Loans and Initial Direct Costs of Leases" (SFAS 91).[11]

SFAS 91 was adopted by the Financial Accounting Standards Board in 1986, effective for fiscal years beginning after December 15, 1987.[12] Paragraph 5 of SFAS 91 provides that "loan origination fees", as defined in SFAS 91, must be "deferred and recognized over the life of the loan as an adjustment of yield (interest income)", and that "direct loan origination costs", as defined in paragraph 6 of SFAS 91, must be "deferred and

---

[11]The banks determined the costs at issue to be deferred for financial reporting purposes in a manner consistent with SFAS 91. Respondent used these amounts to compute the adjustments, but does not rely on SFAS 91 in determining whether these costs can be deducted under sec. 162(a).

[12]The relevant text of SFAS 91 is examined infra.

recognized as a reduction in the yield of the loan" except for certain cases involving "troubled debt restructuring".  Paragraph 5 of SFAS 91 further provides that "Loan origination fees and related direct loan origination costs for a given loan shall be offset and only the net amount shall be deferred and amortized."

FNPC Costs at Issue

FNPC adopted SFAS 91 on a prospective basis effective for transactions entered into after December 31, 1987.  Prior to its application of SFAS 91, FNPC, in accordance with its established accounting practices, treated the costs described in SFAS 91 as current expenses for financial accounting and reporting purposes. In 1988, FNPC began to defer fees and costs described in SFAS 91 for financial accounting and reporting purposes.  For each of the years in issue and, to the best knowledge of management, for all prior years, FNBP currently deducted the costs described in SFAS 91 for Federal income tax purposes.  To apply SFAS 91, FNPC established separate ledger accounts in order to record fees and costs subject to deferral, as well as to reflect the portion of net deferred fees and costs recognized as an adjustment to interest yield in accordance with SFAS 91.  To comply with SFAS 91, FNPC deferred the net amount of the costs and fees in each of the ledger accounts and recognized these net amounts as components of interest income over the estimated lives of the loans.

The FNPC ledger accounts were adjusted at least annually to reflect the portions of the deferred costs (which costs were determined pursuant to SFAS 91) and deferred fees that had been recognized as components of interest income in computing net income for financial reporting purposes. The FNPC ledger accounts were titled: Commercial loans--deferred fees/costs; Installment loans--deferred fees/costs; and Mortgage loans--deferred fees/costs. The balances in a particular FNPC ledger account at the end of a given period reflected the cumulative net amount that had been deferred but had not been recognized for financial reporting purposes by FNPC as a component of interest income under SFAS 91. Current balances in the FNPC ledger accounts did not separately break out the amount of such fees, costs, and adjustments to yield entered in those accounts. A change in the balance of an FNPC ledger account from the end of one year to the end of the next year reflected the net fees and costs deferred by FNPC in calculating its net income for financial reporting purposes under SFAS 91.

The Schedules M-1, Reconciliation of Income per Books With Income per Return, filed with FNPC's Forms 1120 for the periods in question, reflect that the net costs and fees recorded in the FNPC ledger accounts were deferred and amortized pursuant to SFAS 91 for financial accounting purposes, and that the net costs and fees were currently deducted as expenses or reported as income for Federal income tax purposes.

The evidence does not separately identify the allocated costs that were reflected in the FNPC ledger accounts used by respondent in calculating the disallowed amounts.  However, because those ledger accounts were established in order to comply with SFAS 91, the allocated costs reflected in the disallowed amounts necessarily consisted of some combination of the following:  (1) Costs paid by FNBP to third parties for property reports, credit reports and appraisals, and costs for recording security interests, and (2) an allocable portion of the costs incurred by FNBP for salaries and benefits of its employees (and related costs) attributable to the following activities: Evaluating the financial condition of prospective borrowers; evaluating and recording guaranties, collateral and other security arrangements; negotiating loan terms; preparing and processing loan documents; and closing loan transactions.  The costs at issue in the FNPC cases do not include any costs incurred in connection with unsuccessful loan efforts (i.e., where a loan was not originated) or any costs incurred following a loan's origination by FNBP.

Respondent disallowed FNPC's claimed deductions for loan origination costs in the amounts of $568,283, $392,321, and $26,060 in taxable years 1988, 1989, and 1990, respectively. These adjustments represent amounts (net of amortization or yield adjustments) that were deferred by FNPC in its ledger accounts to comply with SFAS 91 for financial accounting and reporting purposes.  The fees and costs included in determining these

amounts were included in income and deducted by FNPC for Federal income tax purposes on a current basis.  Because respondent's adjustments were based on the balances in the FNPC ledger accounts, those adjustments took into account any amortization or yield adjustment that was reflected in such accounts.

### UFB Costs at Issue

UFB adopted SFAS 91 effective for 1988 on a retroactive basis for its outstanding residential mortgage loans and on a prospective basis for its other loans.  Prior to its application of SFAS 91, UFB, in accordance with its established accounting practices, treated the costs described in SFAS 91 as current expenses for financial accounting and reporting purposes.  In 1988, UFB began to defer fees and costs described in SFAS 91 for financial accounting and reporting purposes.  For each of the years in issue and, to the best knowledge of management, for all prior years, UFB currently deducted the costs described in SFAS 91 for Federal income tax purposes.  To apply SFAS 91, UFB established ledger accounts to record fees and costs subject to deferral with respect to several categories of loans in accordance with SFAS 91.  Unlike the ending balances in the FNPC ledger accounts, which reflected only net numbers, the UFB ledger accounts recorded fees and costs separately.  In addition, the amortization or adjustments to yield of amounts deferred under SFAS 91 by UFB were recorded in separate general ledger accounts.

Some of the deferred costs recorded in the UFB ledger accounts were based on standard cost surveys performed by UFB for the purpose of complying with SFAS 91. Different standard cost amounts were determined by UFB for subcategories of loans within a general category. For example, with respect to consumer loans originated in 1991 and 1992, different standard cost amounts were determined for unsecured consumer loans, secured consumer loans for which UFSB performed an appraisal, and secured consumer loans for which an outside third party performed an appraisal. Except with respect to records maintained in connection with its standard cost surveys, UFB did not maintain time records reflecting the amount of time UFSB employees spent working on individual consumer lending transactions. UFB likewise did not maintain records summarizing actual expenditures for items such as supplies, telephone calls, credit reports, property reports, title searches, recording fees and attorney's fees with respect to individual consumer lending transactions.

The fees and costs recorded in the UFB ledger accounts were deferred and recognized as a component of interest income over the estimated expected life (not the contractual life) of the loans to which they related in accordance with SFAS 91. For Federal income tax purposes, the amounts recorded in the UFB ledger accounts were reported by UFB as current items of income or expense. The Schedules M-1 filed with UFB's Forms 1120 for the periods in question reflect that the net amount of the costs and fees recorded in the UFB ledger accounts was deferred and

amortized pursuant to SFAS 91 for financial accounting purposes, and that such costs and fees were currently reported as income or deducted as expenses for Federal income tax purposes.

Respondent calculated the adjustments in issue in the UFB cases based solely on the balances in some of the UFB fee and cost ledger accounts. The fees and costs reflected in those accounts were included in income and deducted by UFB on its Forms 1120 for the years received or incurred. Respondent reduced the adjustments so determined by an allowance for amortization, which was calculated using a half-year convention and was based on an estimated loan life of 3 years. The amortization deduction permitted by respondent differs from the amortization taken into account by UFB as a component of interest income in accordance with SFAS 91.

The costs at issue in the UFB cases include only costs incurred by UFSB with respect to the origination of consumer loans and specifically include only standard costs paid by UFSB to record security interests and standard costs paid to third parties for property reports, credit reports, and appraisals. Respondent made no adjustments with respect to other UFSB loan categories, such as commercial loans and residential and commercial mortgage loans. The costs at issue in the UFB cases do not include any costs incurred in connection with UFSB's unsuccessful loan efforts (i.e., where a loan was not originated) or any costs incurred following a loan's origination by UFSB. The following table reflects the loan origination costs

disallowed and the amortization amounts allowed by respondent for UFSB as well as the increased income determined by respondent as a result of these adjustments:

| Year | Net Loan Origination Cost[1] | Amortization Amount | Increased Income |
|------|------------------------------|---------------------|------------------|
| 1990 | $30,094 | ($5,016) | $25,078 |
| 1991 | 60,225 | (20,069) | 40,156 |
| 1992 | 108,410 | (48,175) | 60,235 |
| 1993 | 101,955 | (78,220) | 23,735 |

[1]This is the excess of deferred loan origination costs over deferred fees.

OPINION

The sole issue for decision is whether certain expenditures incurred in connection with the origination of loans are deductible as ordinary and necessary business expenses under section 162. Respondent determined that they are not deductible because section 263 requires that they be capitalized.

To qualify as an allowable deduction under section 162(a), an item must (1) be paid or incurred during the taxable year; (2) be for carrying on any trade or business; (3) be an expense; (4) be a necessary expense; and (5) be an ordinary expense. Commissioner v. Lincoln Sav. & Loan Association, 403 U.S. 345, 352 (1971). Respondent argues that the expenses in question were not ordinary and, therefore, not currently deductible.

In one sense, the term "ordinary" in section 162 prevents the deduction of expenses that are not normally incurred in the type of business in which the taxpayer is engaged ("ordinary" in

the sense of "normal, usual, or customary" in a taxpayer's trade or business).  Deputy v. du Pont, 308 U.S. 488, 495 (1940).  More importantly, the term "ordinary" serves as a means to "clarify the distinction, often difficult, between those expenses that are currently deductible and those that are in the nature of capital expenditures, which, if deductible at all, must be amortized over the useful life of the asset."  Commissioner v. Tellier, 383 U.S. 687, 689-690 (1966).

No current deduction is allowed for a capital expenditure. Sec. 263(a); INDOPCO, Inc. v. Commissioner, 503 U.S. 79, 83 (1992).  Section 1.263(a)-2(a), Income Tax Regs., includes as examples of capital expenditures "The cost of acquisition, construction, or erection of buildings, machinery and equipment, furniture and fixtures, and similar property having a useful life substantially beyond the taxable year."  Section 461(a) provides that "The amount of any deduction * * * shall be taken for the taxable year which is the proper taxable year under the method of accounting used in computing taxable income."  Section 1.461-1(a)(2), Income Tax Regs., provides further guidance as to when a capital expenditure should be taken into account for Federal income tax purposes under an accrual method of accounting:

> any expenditure which results in the creation of an
> asset having a useful life which extends substantially
> beyond the close of the taxable year may not be
> deductible, or may be deductible only in part, for the
> taxable year in which incurred. * * *[13]

---

[13]Sec. 1.461-1, Income Tax Regs., was amended by T.D. 8408,
(continued...)

The Supreme Court in INDOPCO, Inc. v. Commissioner, supra at 83-84, stated:

The primary effect of characterizing a payment as either a business expense or a capital expenditure concerns the timing of the taxpayer's cost recovery: While business expenses are currently deductible, a capital expenditure usually is amortized and depreciated over the life of the relevant asset, or, where no specific asset or useful life can be ascertained, is deducted upon dissolution of the enterprise. * * * Through provisions such as these, the Code endeavors to match expenses with the revenues of the taxable period to which they are properly attributable, thereby resulting in a more accurate calculation of net income for tax purposes. * * *

Income tax deductions are a matter of legislative grace and the burden of clearly showing the right to the claimed deduction is on the taxpayer. INDOPCO, Inc. v. Commissioner, supra at 84. Moreover, deductions are strictly construed and allowed only "'as there is clear provision therefor.'" Id. (quoting New Colonial Ice Co. v. Helvering, 292 U.S. 435, 440 (1934)).

In light of these general principles, we now turn to the facts of these cases. All the costs at issue were incurred by

_____

[13](...continued)
1992-1 C.B. 155, 165. The relevant changes were effective Apr. 10, 1992, and provide:

under section 263 or 263A, a liability that relates to the creation of an asset having a useful life extending substantially beyond the close of the taxable year is taken into account in the taxable year incurred through capitalization * * * and may later affect the computation of taxable income through depreciation or otherwise over a period including subsequent taxable years, in accordance with applicable Code sections and guidance published by the Secretary. * * *

the banks to create new loans.[14]  The costs, which the banks identified as loan origination costs in their books and records, were deferred by the banks for financial accounting purposes in accordance with SFAS 91 and were currently deducted by them for Federal income tax purposes.[15]  The costs at issue include amounts paid to record security interests and amounts paid to third parties for property reports, credit reports, and appraisals.  In the case of FNBP, the costs at issue also include an allocable portion of the salaries and fringe benefits paid to employees for evaluating the borrower's financial condition, evaluating guaranties, collateral and other security arrangements, negotiating loan terms, preparing and processing loan documents, and closing the loan transaction.

Respondent contends that the loans constitute separate and distinct assets of the banks.  In Commissioner v. Lincoln Sav. & Loan Association, supra at 354, the Supreme Court held that the payments in that case served:

> to create or enhance for Lincoln what is essentially a separate and distinct additional asset and that, as an inevitable consequence, the payment is capital in nature and not an expense, let alone an ordinary

---

[14]While the evidence does not specifically identify the lives of the loans in question, petitioner makes no argument that the lives of such loans did not extend substantially beyond the taxable years in which the loans were originated.

[15]The provisions of SFAS 91 do not control the proper characterization of the costs at issue. Thor Power Tool Co. v. Commissioner, 439 U.S. 522, 542-543 (1979); Old Colony R.R. Co. v. Commissioner, 284 U.S. 552, 562 (1932) (holding that compulsory accounting rules do not control tax consequences).

expense, deductible under § 162(a) in the absence of other factors not established here.  * * *

In INDOPCO, Inc. v. Commissioner, supra at 86, the Supreme Court explained that "Lincoln Savings stands for the simple proposition that a taxpayer's expenditure that 'serves to create or enhance * * * a separate and distinct' asset should be capitalized under § 263."

Petitioner does not argue that the loans are not separate and distinct assets of the banks.  Clearly they are. Rather, petitioner argues that there are "other factors" present which allow deductibility of the loan origination costs.  The factors upon which petitioner relies are that the type of costs in issue are incurred every day in the banking business, they are integral to the day-to-day banking operations of the banks, and they provide only short-term benefits.  Petitioner concludes that the "every-day, recurring costs" at issue are currently deductible under section 162(a).

Recurring Expenses

Relying on Iowa-Des Moines Natl. Bank v. Commissioner, 68 T.C. 872 (1977), affd. 592 F.2d 433 (8th Cir. 1979); Colorado Springs Natl. Bank v. United States, 505 F.2d 1185 (10th Cir. 1974); and First Natl. Bank of South Carolina v. United States, 558 F.2d 721 (4th Cir. 1977), petitioner asserts that credit evaluation and recordkeeping costs, such as those at issue here, are currently deductible and not required to be capitalized under

section 263(a).[16]  These cases addressed the deductibility of costs incurred by taxpayers to expand their banking businesses by issuing credit cards.  The costs deducted by the taxpayers in these cases included payments to "agent banks" for services performed in screening the credit history of prospective credit cardholders, payments to third parties for the collection of credit data, payments to a clearinghouse for entering credit card data on the taxpayer's behalf, and salaries paid to employees in connection with starting up the taxpayer's credit card system, including costs to perform credit evaluations of prospective cardholders.

Petitioner focuses on the similarity of the type of expenses in the instant cases.  However, the holdings in the cases upon which petitioner relies were not simply based on the "everyday, recurring nature" of the costs at issue.  Rather, the critical factor for allowing the current deduction of certain of the expenses in those cases was that the costs "for advertising and promotional aids, salaries, data processing, and credit bureau searches were merely related to the active conduct of an existing business and did not create or enhance a separate and distinct asset or property interest."  Iowa-Des Moines Natl. Bank v. Commissioner, supra at 879 (emphasis added).  Similarly, in Colorado Springs Natl. Bank v. United States, supra at 1192, the Court of Appeals for the Tenth Circuit noted that "The start-up

---

[16]Petitioner also cites First Sec. Bank of Idaho N.A. v. Commissioner, 63 T.C. 644 (1975), affd. 592 F.2d 1050 (9th Cir. 1979), in support of its assertion.

expenditures here challenged did not create a property interest. They produced nothing corporeal or salable." See also First Natl. Bank of South Carolina v. United States, supra at 723 ("Membership in ASBA is not a separate and distinct additional asset created or enhanced by the payments in question.").

The cases cited by petitioner are distinguishable from the facts before us because the expenses in the instant cases created loans which were separate and distinct assets. Although petitioner may be correct that loan origination expenses are "similar" to those incurred in the cases on which it relies, nonetheless, in the instant cases separate and distinct assets were created. Thus, the cited cases do not support petitioner's argument and certainly are not "direct precedent" as it contends. See Ellis Banking Corp. v. Commissioner, T.C. Memo. 1981-123, affd. in part and remanded in part on another issue 688 F.2d 1376 (11th Cir. 1982) (distinguishing cases the taxpayer relied upon by the fact that separate and distinct assets were not acquired).

The facts and circumstances of each case must be examined to determine whether an expense should be capitalized or currently deducted. See INDOPCO, Inc. v. Commissioner, 503 U.S. at 86; Deputy v. du Pont, 308 U.S. at 496; United States v. General Bancshares Corp., 388 F.2d 184, 187-188 (8th Cir. 1968) (expenditures must be viewed "in context with the transaction in which they are incurred to assess their proper characterization."). A particular cost, no matter what its type, may be deductible in one context but may be required to be

capitalized in another context.  For example, in <u>Commissioner v. Idaho Power Co.</u>, 418 U.S. 1, 13 (1974), the Supreme Court noted the following regarding wages paid by a taxpayer in its trade or business:

> Of course, reasonable wages paid in the carrying on of a trade or business qualify as a deduction from gross income.  * * *  But when wages are paid in connection with the construction or acquisition of a capital asset, they must be capitalized and are then entitled to be amortized over the life of the capital asset so acquired.[17]

Simply because other cases have allowed a current deduction for similar expenses in different contexts does not require the same result here.  Expenditures, which otherwise might qualify as currently deductible must be capitalized if they are incurred in the acquisition of a separate and distinct asset regardless of their recurring nature.  "[A]n expenditure that would ordinarily be a deductible expense must nonetheless be capitalized if it is incurred in connection with the acquisition of a capital asset." <u>Ellis Banking Corp. v. Commissioner</u>, 688 F.2d at 1379.

In <u>Commissioner v. Idaho Power Co.</u>, <u>supra</u> at 16, the Supreme Court considered the interrelationship between Part VI (which includes section 161 and following, relating to items deductible)

---

[17]"It is clear that an expenditure need not be for a capital asset, as described in Section 1221 * * * in order to be classified as a capital expenditure." <u>Georator Corp. v. United States</u>, 485 F.2d 283, 285 (4th Cir. 1973); see also <u>NCNB Corp. v. United States</u>, 684 F.2d 285, 290 n.7 (4th Cir. 1982) (recognizing that, although sec. 1221 defines capital asset, "it does so for the purpose of determining capital gains and losses and not for determining what expenditures are capital.").

and Part IX (which includes section 261 and following, relating to items not deductible) of the Internal Revenue Code. The Court held that the priority-ordering directives of sections 161 and 261 require that the capitalization provision of section 263(a) take precedence over section 162(a). Commissioner v. Idaho Power Co., supra at 17. Section 161 provides that "In computing taxable income under section 63, there shall be allowed as deductions the items specified in this part, subject to the exceptions provided in part IX". As the Supreme Court explained:

> The clear import of § 161 is that, with stated exceptions set forth either in § 263 itself or provided for elsewhere (as, for example, in § 404 relating to pension contributions), none of which is applicable here, an expenditure incurred in acquiring capital assets must be capitalized even when the expenditure otherwise might be deemed deductible under Part VI. [Commissioner v. Idaho Power Co., supra at 17; emphasis added.]

And, as the Supreme Court more recently observed:

> The notion that deductions are exceptions to the norm of capitalization finds support in various aspects of the Code. Deductions are specifically enumerated and thus are subject to disallowance in favor of capitalization. See §§ 161 and 261. Nondeductible capital expenditures, by contrast, are not exhaustively enumerated in the Code; rather than providing a "complete list of nondeductible expenditures," Lincoln Savings, 403 U.S., at 358, * * * § 263 serves as a general means of distinguishing capital expenditures from current expenses. See Commissioner v. Idaho Power Co., 418 U.S., at 16. * * * For these reasons, deductions are strictly construed and allowed only "as there is a clear provision therefor." [INDOPCO, Inc. v. Commissioner, 503 U.S. at 84.]

Petitioner failed to cite, nor do we find, any authority which stands for the proposition that expenses incurred in the creation of separate and distinct assets are currently deductible if such expenses are incurred regularly. Accordingly, the fact that the banks incurred expenditures on a recurring basis does not ensure their characterization as "ordinary" if they are incurred in the creation of a separate and distinct asset. See Helvering v. Winmill, 305 U.S. 79, 84 (1938) (denying deduction for commissions even though they were regular and recurring expenses in the taxpayer's business of buying and selling securities).

Integral Part of Business

Petitioner contends that another important factor in determining whether the particular expenditures should be capitalized or currently deducted is that they are integrally related to the conduct of the banks' business. Petitioner argues that this factor addresses the pragmatic concern that, in some businesses, almost all costs theoretically could be allocated in some fashion to the acquisition of assets, so that under an overly expansive view of section 263, the availability of section 162 deductions for such businesses would be largely eliminated. We have examined the cases and revenue rulings cited by petitioner in support of this argument and do not find them controlling, nor do we find that they support the proposition for which petitioner contends.

Furthermore, petitioner's fear of an "overly expansive" application of section 263 is not warranted here. It is clear that the expenses at issue are directly related to the creation of the loans. Petitioner provides little, if any, explanation regarding the method the banks employed in identifying the expenses associated with the origination of the loans. However, because the parties stipulated that the banks deferred the expenses at issue for financial accounting purposes in a manner consistent with SFAS 91, we turn to the definitions contained therein for such explanation.[18]

Generally, paragraph 5 of SFAS 91 requires that direct loan origination costs "shall be deferred and recognized as a reduction in the yield of the loan".[19] Paragraphs 6 and 7 of SFAS 91 define what type of costs must be deferred and those which are currently expensed:

> 6. Direct loan origination costs of a completed loan shall include only (a) incremental direct costs of loan origination incurred in transactions with independent third parties for that loan and (b) certain costs directly related to specified activities performed by the lender for that loan. Those activities are: evaluating the prospective borrower's financial

[18]We reiterate that SFAS 91 does not control the correct characterization of the subject expenses. We merely examine the statement to define the nature of the costs at issue and how they relate to the asset created. Furthermore, we note that petitioner does not argue that the direct costs of the loans, as reflected in the banks' financial accounting records, were inaccurately or improperly allocated.

[19]Paragraph 5 of SFAS 91 also requires that "Loan origination fees and related direct loan origination costs for a given loan shall be offset and only the net amount shall be deferred and amortized."

condition; evaluating and recording guarantees, collateral, and other security arrangements; negotiating loan terms; preparing and processing loan documents; and closing the transaction. The costs directly related to those activities shall include only that portion of the employees' total compensation and payroll-related fringe benefits directly related to time spent performing those activities for that loan and other costs related to those activities that would not have been incurred but for that loan.

7.    All other lending-related costs, including costs related to activities performed by the lender for advertising, soliciting potential borrowers, servicing existing loans, and other ancillary activities related to establishing and monitoring credit policies, supervision, and administration, shall be charged to expense as incurred. Employees' compensation and fringe benefits related to those activities, unsuccessful loan origination efforts, and idle time shall be charged to expense as incurred. Administrative costs, rent, depreciation, and all other occupancy and equipment costs are considered indirect costs and shall be charged to expense as incurred.[20]

It is clear that the costs at issue are only those directly related to the creation of the loans. They do not include costs associated with loans that were not completed, nor do they include costs incurred after the closing of a loan.

Short-term Benefit of Expenses

Petitioner presented the testimony of several witnesses at trial in an attempt to prove that the value of credit reports and

---

[20]Appendix C to SFAS 91 defines the term "incremental direct costs" to mean "Costs to originate a loan that (a) result directly from and are essential to the lending transaction and (b) would not have been incurred by the lender had that lending transaction not occurred."

similar financial data lasts only a short period of time.[21]  We do not find this evidence determinative of the issue before us.[22]

A bank obtains loan applications, credit reports and similar data to evaluate a potential borrower's financial condition for purposes of determining whether to make a loan.  When funds are disbursed and a loan is created, the loan becomes a separate and distinct bank asset.  Under the reasoning of Commissioner v. Lincoln Sav. & Loan Association, 403 U.S. at 354, costs that serve to create a loan, such as costs of credit reports and financial evaluations, are costs that must be capitalized and amortized over the useful lives of those loans.  "The requirement that costs be capitalized extends beyond the price payable to the seller to include any costs incurred by the buyer in connection with the purchase, such as appraisals of the property or the costs of meeting any conditions of the sale."  Ellis Banking Corp. v. Commissioner, 688 F.2d 1376, 1379 (11th Cir. 1982); see also Woodward v. Commissioner, 397 U.S. 572 (1970) (ancillary expenses, such as legal, accounting, and appraisal costs,

---

[21]We note that some of the expenditures in issue were incurred in connection with the preparation and recording of notes and security interests.  The rights created and secured by these expenditures clearly remain in effect for the life of the loan.  The record does not contain a breakdown showing the amounts of the various types of expenditures.

[22]Although the short useful life of credit information was a factor considered by the court in Iowa-Des Moines Natl. Bank v. Commissioner, 592 F.2d 433 (8th Cir. 1979), affg. 68 T.C. 872 (1977), we found that the expenditures at issue in that case did not create or enhance a separate and distinct asset or property interest.  Therefore, Iowa-Des Moines Natl. Bank v. Commissioner, supra, is distinguishable.

incurred in acquiring an asset are capital expenditures); United States v. Hilton Hotels Corp., 397 U.S. 580 (1970) (fees paid to a consulting firm and the cost of legal and other professional services incurred in connection with appraisal proceeding to value shares of dissenting shareholders in merged corporation were capital expenditures).

Credit reports, appraisals, and similar information about prospective borrowers are critical in deciding whether to make a loan.  It is the basis on which banks make their credit risk management decisions.  While the specific information available when a loan is made may become outdated in a relatively short period of time, the quality of the decision to make a loan (and thereby acquire an asset) is predicated on such information.  The soundness of the decision to make a loan is assimilated into the quality and value of the loan.  Thus, the direct costs of the decision-making process should be assimilated into the asset that was acquired.  See Commissioner v. Idaho Power Co., 418 U.S. at 14 (held that construction-related depreciation cannot be currently deducted "rather, the investment in the equipment is assimilated into the cost of the capital asset constructed.")

In Strouth v. Commissioner, T.C. Memo. 1987-552, the taxpayers were partners in several partnerships engaged in the business of purchasing and leasing office equipment to local companies and professional offices.  Generally, the terms of these leases ranged from 3 to 5 years.  The partnerships paid a corporation to perform services associated with the leasing

activity, which included, among other things, securing potential leases, reviewing the lessee's application, checking the lessee's credit and trade references, and drafting lease documents.  Id. We held that such expenditures were capital expenditures, because "they secure for the partnerships the right to receive benefits under each lease that last well beyond the taxable year of the expenditure."  Id.

Costs associated with the origination of the loans contribute to the generation of interest income and provide a long-term benefit that the banks realize over the lives of the underlying loans.  The resulting stream of income extends well beyond the year in which the costs were incurred.  It was this income benefit that was the primary purpose for incurring these expenditures.[23]  While the useful life of a credit report and other financial data may be of short duration, the useful life of the asset they serve to create is not.  Therefore, like the appraisal costs in Woodward v. Commissioner, supra, and United States v. Hilton Hotels Corp., supra, the construction-related depreciation in Commissioner v. Idaho Power Co., supra, and the lease acquisition costs in Strouth v. Commissioner, supra, the

---

[23]Petitioner argues that because the banks used the loan application process as an opportunity to sell other services and products, the costs associated with that function are not capital expenses.  Petitioner does not attempt to define which costs are related to loan origination and which are related to other selling costs.  However, SFAS 91, par. 6 provides that the direct loan origination costs consist only of those costs related to activities "that would not have been incurred but for that loan." (Emphasis added.)  Therefore, by definition, the costs at issue do not include additional selling expenses.

loan origination costs herein must be assimilated into the cost of the asset created.

Capitalizing expenditures which are connected with the creation of an asset having an extended life is an important factor in determining net income.  As the Court of Appeals for the Eleventh Circuit observed:

> The function of these rules is to achieve an accurate measure of net income for the year by matching outlays with the revenues attributable to them and recognizing both during the same taxable year.  When an outlay is connected to the acquisition of an asset with an extended life, it would understate current net income to deduct the outlay immediately.  To the purchaser, such outlays are part of the cost of acquisition of the asset, and the asset will contribute to revenues over an extended period.  Consequently, the outlays are properly matched with revenues that are recognized later and, to obtain an accurate measure of net income, the taxpayer should deduct the outlays over the period when the revenues are produced.  [Ellis Banking Corp. v. Commissioner, supra at 1379.]

The same is true here.  The costs at issue are directly connected to the creation of loans, which constitute separate and distinct assets that are the banks' primary source of income.  Revenues, in the form of interest payments, are received over the life of the individual loans.  In order to accurately measure the banks' net income, the direct costs of originating the loans must be capitalized and amortized over the life of the loans.

Change in Method of Accounting

Petitioner contends that because the banks have consistently deducted the costs at issue and, in so doing, have been acting in

accordance with established industry practice that has been in effect for decades, respondent's characterization of these costs as capital expenditures would amount to a change in its accounting "methods" contrary to section 446. Section 446(a) permits a taxpayer to compute taxable income "under the method of accounting on the basis of which the taxpayer regularly computes his income in keeping his books." A taxpayer's "method of accounting" includes not only the overall method of accounting, but also the accounting treatment of any item. Sec. 1.446-1(a)(1), Income Tax Regs. However, section 446(b) provides in effect that if the taxpayer's method does not clearly reflect income, the Secretary may redetermine and recompute the taxable income under a method which, in his opinion, does clearly reflect income.[24] Section 446(b) imposes a burden of proof upon petitioner to demonstrate that respondent abused his discretion in changing petitioner's accounting method. Resnik v. Commissioner, 66 T.C. 74, 78 (1976), affd. per curiam 555 F.2d 634 (7th Cir. 1977). Petitioner's burden of proof is heavier than merely proving that the determination of the Commissioner was erroneous. Seligman v. Commissioner, 84 T.C. 191, 199-200 n.9 (1985), affd. 796 F.2d 116 (5th Cir. 1986).

In Electric & Neon, Inc. v. Commissioner, 56 T.C. 1324 (1971), affd. without published opinion 496 F.2d 876 (5th Cir. 1974), the taxpayer improperly characterized capital expenditures

---

[24]Respondent argues that the adjustments in these cases are based on sec. 263(a), and not on his authority under sec. 446(b).

(costs the taxpayer incurred in constructing signs with respect to which it was the lessor) as current deductions.[25]  Despite this error, the taxpayer requested that we approve its accounting method on the grounds that its method "clearly reflected income over a period of years, and that such practices had been consistently used over a long period of time."  Id. at 1333.  In holding that the taxpayer's improper characterization of capital expenditures failed to reflect income clearly, we stated:

> As a result of its use of an improper method, E & N's taxable income would be seriously understated in a year when many new signs were constructed for lease, and just as seriously overstated in a year when very few signs were constructed, with the result of making the corporation's financial fortunes appear to be sinking when in fact it was enjoying great success, and rising when in fact its business was seriously diminished. * * *  "Income must be reflected with as much accuracy as recognized methods of accounting permit."  Fort Howard Paper Co. [v. Commissioner], 49 T.C. 275, 284 (1967); see also Caldwell v. Commissioner, 202 F.2d 112, 115 [(2d Cir. 1953)], affirming on this issue a Memorandum Opinion of this Court.  That E & N's accounting method with respect to the treatment of the cost of the leased signs fell short of this requirement is obvious.  [Electric & Neon, Inc. v. Commissioner, supra at 1333.]

---

[25]The taxpayer in Electric & Neon, Inc. v. Commissioner, 56 T.C. 1324 (1971), affd. without published opinion 496 F.2d 876 (5th Cir. 1974), treated the entire costs of constructing the signs it subsequently leased, including materials, supplies, labor, freight, supervisory salary, workman's compensation insurance, payroll taxes, licenses, and miscellaneous job costs, as a current expense for Federal income tax purposes.  Id. at 1326.  Generally, the signs the taxpayer constructed had useful lives substantially beyond the taxable year of construction and the usual term for the original lease of these signs was 5 years. Id. at 1332-1333.

We also pointed out in Electric & Neon, Inc. v. Commissioner, supra at 1333:

> while consistency is highly desirable when combined with some acceptable method of accounting, it is not a substitute for correctness; the respondent is justified in requiring a change in a taxpayer's method of accounting which, although consistently used over a period of years, is erroneous, and does not clearly reflect income.

Accordingly, we find that the banks' current deduction of the costs associated with the origination of the loans did not clearly reflect their income and, therefore, was not a proper method of accounting.[26]  See also Commissioner v. Idaho Power Co., 418 U.S. at 14 ("capitalization prevents the distortion of income that would otherwise occur if depreciation properly allocable to asset acquisition were deducted from gross income currently realized.").  It is apparent that the banks' current deduction of the costs at issue improperly accelerated the tax benefits derived from those costs and did not properly match the costs with the interest income produced by the loans.  We find that capitalization of these expenses, subject to recovery by means of amortization over the life of the loans, does clearly reflect the banks' income and that respondent was within his broad authority to require this change.

Legislative Necessity

---

[26]We note that petitioner did not offer any evidence to show how the current deduction of the costs at issue clearly reflects the banks' income.

Petitioner's final argument is based on its observation that, following our opinion in Iowa-Des Moines Natl. Bank v. Commissioner, 68 T.C. 872 (1977), Congress has, on a number of occasions, enacted specific legislation regarding the income taxation of banks and other legislation that generally deals with the capitalization of the costs of acquiring certain types of assets,[27] but has not availed itself of the opportunity to address the deductibility of loan origination costs.  Petitioner argues that this, when coupled with the purported longstanding industry practice of currently deducting costs like those in issue, suggests that we should allow petitioner to continue to deduct loan origination costs unless Congress acts to deny such deductions.  We disagree.

Petitioner's argument presupposes that because Congress has not specifically addressed the deductibility of a particular item over the years, it must mean that Congress intends for that item to be currently deductible.[28]  Deductions, however, are matters of legislative grace and are strictly construed and allowed only when "'there is a clear provision therefor.'"  INDOPCO, Inc. v.

---

[27]For example, the capitalization provisions of sec. 263A apply only to real and tangible personal property produced by the taxpayer or real or personal property which is acquired for resale.  Sec. 263A does not apply to costs incurred by a financial institution in originating loans.  Sec. 1.263A-2(a)(2)(i), Income Tax Regs.

[28]Petitioner's argument also implies that we are somehow departing from our opinion in Iowa-Des Moines Natl. Bank v. Commissioner, 68 T.C. 872 (1977).  However, as we explained supra p.27, the expenditures at issue in that case did not create or enhance a separate and distinct asset.

<u>Commissioner</u>, 503 U.S. at 84 (quoting <u>Deputy v. du Pont</u>, 308 U.S. at 493). The fact that Congress has not chosen to act in this area has no special relevance in these cases.

## <u>Conclusion</u>

We have found that the expenditures at issue were incurred in creating loans that were separate and distinct assets. We hold that the banks were not entitled to deduct these expenditures under section 162(a). Rather, they are to be capitalized under section 263(a) and recovered through amortization.

<u>Decisions will be entered under Rule 155</u>.