The **COLORADO SPRINGS NATIONAL BANK**, a National Banking Association, Plaintiff-Appellee,

v.

**UNITED STATES of America**, Defendant-Appellant.

**No. 74–1073.**

United States Court of Appeals,
Tenth Circuit.

Argued Sept. 10, 1974.

Decided Nov. 11, 1974.

Rendle Myer, Denver, Colo. (Richard W. Hanes, Gregory R. Piche, Spurgeon, Aman & Hanes, Colorado Springs, Colo., and Neef, Swanson & Myer, Denver, Colo., on the brief), for plaintiff-appellee.

Gary R. Allen, Atty., Tax Div., Dept. of Justice (Scott P. Crampton, Asst. Atty. Gen., Meyer Rothwacks, Jonathan S. Cohen, and Charles E. Anderson, Attys., Tax Div., Dept. of Justice, and James L. Treece, U. S. Atty., of counsel, on the brief), for defendant-appellant.

John Fletcher Rolph, III, and Henry C. Ruempler, III, Washington, D. C., filed a brief for amicus curiae The American Bankers Ass'n.

R. Michael Duncan and Robert R. Rickett, Washington, D. C., filed a brief for amicus curiae Interbank Card Ass'n.

Before BREITENSTEIN, BARRETT and DOYLE, Circuit Judges.

BREITENSTEIN, Circuit Judge.

This is an action under 26 U.S.C. § 7422 for the refund of federal income taxes. The question is whether certain costs incurred by taxpayer, appellee Colorado Springs National Bank, in its participation in the Master Charge credit card system are deductible as business expenses under 26 U.S.C. § 162(a). Taxpayer had judgment for $13,915.55 plus interest and the United States appeals. We affirm.

I

Taxpayer is a national bank organized and existing under the provisions of Title 12, U.S.C. It was chartered in 1907 and since then has engaged in banking in the Colorado Springs, Colorado, area. In 1969 it was the third largest bank in the area. It is a full service, commercial bank which during its life has made a great variety of loans.

In 1967 Colorado National Bank of Denver acquired the right to use the BankAmericard credit card system and to affiliate with other Colorado banks in that activity. BankAmericard permits the franchising of only one bank in a particular community. First National Bank of Colorado Springs obtained the right to use BankAmericard in the Colorado Springs area and taxpayer failed in its efforts to join BankAmericard. Taxpayer then developed a credit card system of its own known as V.I.P. (Verified Instant Payment). Essentially, V.I.P. was a check guarantee concept coupled with a revolving line of automatic credit extension to cover checking account overdrafts. V.I.P. did not provide a competitive alternative to BankAmericard because of its limited scope and check dependence.

In late 1968, the Master Charge credit card system was introduced to Colorado. Three Denver banks organized Mountain States Bankcard Association (MSBA), a non-profit corporation, to handle the Master Charge program through Interbank Card Association. Interbank is a nationwide clearinghouse for Master Charge cards. On February 11, 1969, taxpayer became a member of MSBA by the payment of a $10,000 fee. This fee was a one-time, non-refundable payment that could not be separately trans-

ferred. If the bank were sold, the Master Charge franchise or license would go with the bank.

Master Charge requires three basic contractual relationships. First is a contract between a bank and a participating merchant. This provides that the merchant will honor all cards issued to cardholders by member banks and that the bank will accept from the merchant for immediate deposit or cash, usually at a negotiated discount, the sales slips signed by cardholders when making purchases. The bank takes all of the credit risk.

Second is a contract between the bank and the cardholder by which the cardholder assumes responsibility for credit extended to the holder on the basis of the card and agrees to pay the bank the obligations evidencing such credit, with interest or finance charges if not paid within a specified time after the bank's billing. The cardholder releases the bank from all defenses and claims which the holder may have against the merchant who honored the card.

Third is an interchange agreement among the member banks providing rules and mechanisms for clearing authorizations and for processing and charging card sales slips to the card issuing bank. This arrangement is comparable to the check-clearing mechanisms furnished by clearinghouses.

During April, 1969, banks participating in the MSBA Master Charge program began soliciting merchants to participate in the program. On June 1, 1969, those merchants were allowed to accept Master Charge transactions from tourists who utilized Master Charge cards on a local basis in other parts of the country. Eighty percent of the merchants signed up by taxpayer to participate in 1969 were existing customers of taxpayer. On July 1, 1969, taxpayer issued its own Master Charge cards to selected individuals, seventy-two percent of whom were existing customers of taxpayer.

Between February 11, 1969, when taxpayer acquired its Master Charge authorization, and July 1, when its participation in the system became operational by the issuance of its own Master Charge cards, taxpayer incurred preoperation expenses in addition to the $10,000 MSBA fee. These fell into the following general categories:

1. Computer costs, $1,329.50, incurred to keypunch and insert its customer account data into the MSBA computer.

2. Computer service and assessment fees, $12,788.50, paid to MSBA. These included a new merchant fee for the addition of each merchant to the system, a cardholder fee for the addition of each cardholder to the system, and a maintenance fee for computer operation.

3. Advertising and promotional costs, $3,826.74, paid by taxpayer to familiarize the public with the Master Charge system.

4. Credit Bureau reports, $7,079.-15, secured by taxpayer to ascertain the risks present in credit extension to cardholders.

5. Travel, education, and entertainment expenses, $1,151.96, of employees reimbursed by taxpayer for attendance at MSBA meetings held to motivate the employees and familiarize them with the Master Charge system.

6. Temporary clerical service, $177.38, required by taxpayer to augment its existing staff.

These start-up expenses totalled $26,-353.23. In its federal income tax return for 1969, taxpayer claimed them and the $10,000 fee paid to MSBA as deductible business expenses. Internal Revenue Service disallowed the deductions and assessed additional taxes amounting to $19,194.56. Taxpayer paid the assessment, filed claim for refund which was disallowed, and brought this suit.

At the conclusion of the trial the court made oral findings which will be discussed later. It held that the $10,000 MSBA fee was a capital expenditure and that the start-up costs were deduct-

ible business expenses. Taxpayer has not appealed from the adverse ruling on the fee. The United States has appealed from the ruling on the start-up expenses. We are not concerned with the deductibility of the fee or with any problem relating to its amortization. With relation to above Item 2 of the start-up costs, the United States concedes in its brief that a $1,962.25 portion thereof, representing a recurring quarterly charge of MSBA for maintaining files on credit cardholders, is a deductible business expense.

## II

Bank credit cards play an important role in consumer transactions. Amicus Interbank says that about 6,000 banks have issued over 30 million Master Charge cards which are accepted at over one million retail outlets, and that at the end of 1970 1,200 banks reported outstandings on credit cards of 3.8 billion dollars. Amicus American Bankers Association, with a membership of over 13,000 commercial banks, says that a determination of the issue presented will affect the tax liabilities of commercial banks in the amount of "several hundred million dollars."

The Comptroller of the Currency who is charged by Congress with supervision and regulation of national banks has ruled that expenditures by commercial banks for the development and implementation of credit card programs must be charged to expense rather that capital. In an August 21, 1972, letter to the Assistant Secretary for Tax Policy, U. S. Treasury Department, he wrote that: "This policy has as its basis our responsibility of assuring the solvency and liquidity of National Banks and the concurrent protection of depositors and shareholders." He added that if IRS disallows the current deduction of such expenditures, " * * * banks will be reluctant to expend funds to develop, expand, and make technological advances in banking services. Clearly, such a result would be contrary to the objectives of our expanding national economy."

Compulsory accounting rules of a regulatory agency do not control tax consequences. See Commissioner of Internal Revenue v. Lincoln Savings & Loan Ass'n, 403 U.S. 345, 355, 91 S.Ct. 1893, 29 L.Ed.2d 519, and Old Colony Railroad Co. v. Commissioner of Internal Revenue, 284 U.S. 552, 562, 52 S.Ct. 217, 76 L.Ed. 484. We recognized this principle in Mountain Fuel Supply Co. v. United States, 10 Cir., 449 F.2d 816, 822, cert. denied, 405 U.S. 989, 92 S.Ct. 1251, 31 L.Ed.2d 455, and said, however, that accounting methods of regulatory agencies "demonstrate a reason why some accommodation should be made when possible." Although the action of the Comptroller is not determinative, it is a factor for consideration.

## III

The pertinent provision of 26 U.S.C. § 162(a) allows as a deduction "all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business." The question is whether the start-up costs of taxpayer's participation in the Master Charge program are deductible under § 162(a).

Section 162(a) sets up five separate requirements, all of which must be satisfied to support deduction. There must be (1) an ordinary and (2) necessary (3) expense (4) incurred during the taxable year (5) in carrying on a trade or business. See Lincoln Savings, 403 U.S. at 352, 91 S.Ct. 1893. The United States argues that the expenses in question were not ordinary and were not incurred in carrying on the business to which they relate. The reasoning of the government is that the expenses were the preoperation costs for entry into a new business.

At the conclusion of the trial the court made oral findings from the bench. These were not supplemented by written findings of fact and conclusions of law. The parties have stipulated that the bench ruling "shall constitute the Trial Court's findings of fact and con-

clusions of law in compliance with Rule 52(a) of the Federal Rules of Civil Procedure" and have waived any assertion of noncompliance with that rule. The court said:

> "I find and I hold that this particular field, that is the credit card field, is a new type of business that this bank had not engaged in prior to its being licensed by Master Charge card Association. It is not just an extension of the lending field, but it is a new concept that was developed and is being used."

Thereafter, the court found that the MSBA fee paid by taxpayer was "an intangible asset which should either be amortized or capitalized." The court then discussed many of the items in the start-up costs and said that all of those costs were ordinary and necessary expenses in the taxable year and "were for carrying on of a business."

The government argues that the new-business finding is supported by substantial evidence, is not clearly erroneous, and is binding on the appellate court. It says further that the allowance of the deduction of the start-up costs was inconsistent with the new-business finding and must be rejected. Bank answers by saying that the government lifts the "new type of business" statement out of context and attributes to it "a semantic significance far beyond that intended or contemplated"; and that the entire opinion shows that the statement was limited to the MSBA fee.

Any discussion by us of this phase of the controversy will be unproductive because we have no way of ascertaining the intent of the trial court. Further, nothing will be gained by exploration of the mysterious differences between questions of fact, or law, or mixed fact and law. The basic facts pertaining to the business of the bank, the bank credit card program, and the nature of the expenditures are not in dispute. True, each side had an expert who gave opinions on these matters and those opinions were in conflict. Nothing in the record shows that the trial court based any finding or any conclusion on any opinion of an expert. Our disposition of the case is not dependent on, or influenced by, those opinions. Hence, we have no credibility question. Determination of whether the bank credit card business is "new" and of whether the start-up expenses are "ordinary and necessary" requires conclusions from undisputed facts. We are in as good position as was the trial court to draw those conclusions. Whatever label may be put on them, the ultimate question is the application of § 162(a) to the facts. The clearly erroneous rule does not apply. See 9 Fed.Pract. & Proc. §§ 2488 and 2589, pp. 749–759, and 5A Moore's Federal Practice Par. 52.05[1] pp. 2693–2697.

## IV

The business of the taxpayer is banking. As a national bank it is bound by, and must comply with, applicable federal statutes. Section 24, 12 U.S.C., provides in Subparagraph Seventh that a national bank may exercise "all such incidental powers as shall be necessary to carry on the business of banking," including "discounting and negotiating promissory notes, drafts, bills of exchange, and other evidences of debt," "receiving deposits," and "loaning money on personal security." Under the rulings of the Comptroller of the Currency, a bank may issue credit cards. See Comptroller's Manual for National Banks, Pars, 7.7376(b) and 7.7378. The Federal Reserve Board recognizes that bank credit cards are "bank services." See 12 C.F.R. § 219.104(d). In United States v. Philadelphia National Bank, 374 U.S. 321, 326, 83 S.Ct. 1715, 1721, 10 L.Ed.2d 915, the Court refers to the key role which commercial banks play in the national economy and says that commercial banking "describes a congeries of services and credit devices." Listed among the principal banking products are "bank credit cards." Ibid. at n. 5.

The government does not contend that the participation by taxpayer in Master Charge is ultra vires. Instead it separates credit card business from other bank business. The claim is that bank credit cards are a new "area" or "line" of business designed to return a "future benefit." The intent to make a future profit is obvious. Changes in methods of operation often have a direct bearing on costs and profits.

■ Before entering the credit card field, taxpayer made loans on accounts receivable and personal loans covering consumer transactions. For years banks, including taxpayer, have issued letters of credit. The credit card program furnishes a facility to handle these operations in a simple manner adaptable to operation through modern computers. A letter of credit is "a letter whereby one person requests some other person to advance money or give credit to a third person, and promises to repay the same to the person making the advancement." Second Nat. Bank of Toledo v. M. Samuel & Sons, Inc., 2 Cir., 12 F.2d 963, 966, cert. denied, 273 U.S. 720, 47 S.Ct. 110, 71 L.Ed. 857. The same function is performed by the handy, plastic card issued by the bank. The participating merchant honors the card in payment for merchandise, the issuing bank pays the merchant, and the card user is liable to the bank.

Banks, including taxpayer, have for years made loans to merchants on accounts receivable. The credit card system performs the same function more easily. The merchant sends the sales slip to the bank which pays him, or gives him credit, for the amount shown on the slip less a negotiated discount. The only change is in the method. Instead of getting a bank loan on the security of accounts receivable, the merchant receives a discounted payment immediately. Instead of getting loan interest, bank receives the discount.

Loans for consumer purchases are a recognized part of our economy. Over the years taxpayer, along with other commercial banks, has made many such loans in varying forms. The credit card system simplifies the procedure. The cardholder is charged with the amount of the purchase and, unless he pays the bank within a specified time after the billing date, he must pay interest or a finance charge. The consumer gets the credit and the bank receives payment for the extension of credit.

The credit card system takes advantage of modern technology. After a card is used, a key-punched sales slip is placed in a computer which processes and routes the transaction so that the necessary charges and credits will be made. To paraphrase the Comptroller, the use of these modern facilities furthers the objectives of our expanding national economy.

■ The credit card system enables a bank to carry on an old business in a new way. A new method is distinguishable from a new business. Richmond Television Corporation v. United States, 4 Cir., 345 F.2d 901, vacated on other grounds, 382 U.S. 68, 86 S.Ct. 233, 15 L.Ed.2d 143, is not in point. In that case taxpayer, Richmond Television, was organized to operate a television station. Its controlling stockholder was the owner and operator of a radio station. Before Richmond secured a television license from the Federal Communications Commission, the radio station paid out substantial sums in preparation for the television operation. Richmond paid the radio station for those preoperation costs and then claimed that expense as a business deduction under § 162(a). The deduction was disallowed on the ground that taxpayer was not in business during the period in question. 345 F.2d at 907. In Richmond the taxpayer was not licensed to operate a television station whereas in the instant case the taxpayer was, and for many years had been, chartered as a national bank. In Richmond the expenses for which a deduction was claimed were incurred in prior years. In the instant case, the expenses were incurred during the tax year in question.

■ A more pertinent decision is Briarcliff Candy Corporation v. Com-

missioner of Internal Revenue, 2 Cir., 475 F.2d 775. Taxpayer was engaged in the manufacture and sale of candy with 80% of its sales through its own retail stores and the remainder through wholesalers. The retail stores were in thickly populated urban centers. Population shifts to suburbs adversely affected taxpayer's sales. It set up a franchise division to make agency and franchise agreements with non-owned retail outlets. Before the agency system became operative various promotional expenses were incurred and claimed as a § 162(a) deduction. The court said, 475 F.2d at 782, that "expenditures by an already established and going concern in developing a new sales territory are deductible under § 162," and allowed the deduction. In the instant case we have an established bank which adopted a new method, use of cards and computers, to conduct an old business, financing of consumer transactions. The business requirement of § 162(a) was satisfied.

## V

Under § 162(a) deductible business expenses are those that are ordinary and necessary. The start-up expenses in question may be placed in three general groups: (1) computer costs, (2) credit checks, and (3) promotional activities. The ordinary and necessary test must be applied to each group.

The Supreme Court has considered the ordinary and necessary requirements on a number of occasions. See Lincoln Savings, 403 U.S. at 352–353, 91 S.Ct. 1893. To be necessary an expense must be "appropriate and helpful" to "the development of the [taxpayer's] business." Commissioner of Internal Revenue v. Tellier, 383 U.S. 687, 689, 86 S.Ct. 1118, 1120, 16 L.Ed.2d 185, quoting from Welch v. Helvering, 290 U.S. 111, 113, 54 S.Ct. 8, 78 L.Ed. 212.

■ Each category of start-up costs must be tested against these standards. A computer is a mechanical device for receiving, storing, and retrieving information. It performs the functions which at one time were performed by clerks

in receiving and filing information and in keeping books on that information. Computers must be programmed and clerks must be trained. Computer charges are recurring just as are clerical salaries. The functions of each appropriately aid the conduct of taxpayer's business.

Extension of credit requires evaluation of risk. Credit investigations are not new in the banking business. All that taxpayer has done is to determine the risk involved in the issuance of Master Charge cards to the recipients. Such risk determination is appropriate and useful to development of taxpayer's banking business.

The next item relates to expenses for promotion, solicitation, training, and advertising during the pertinent tax year. Taxpayer here sought to encourage the sale and use of an old product, financing of consumer transactions, in a new package, credit cards. Eighty percent of the merchants signed by taxpayer for participation in the Master Charge program and 72% of the individuals to whom taxpayer issued Master Charge cards were already customers of taxpayer. The expenses now under consideration were for the promotion of the sale of a bank product, financing of consumer transactions. They were both appropriate and helpful to the development of taxpayer's business. We conclude that all of the challenged start-up costs meet the necessary requirement.

## VI

■ The government insists that the start-up costs are not ordinary expenses because they generate future economic benefits. Participation in the Master Charge system was intended to enhance income. Some of that income was received in the tax year and some, hopefully, will come in the future.

In Hotel Kingkade v. Commissioner of Internal Revenue, 10 Cir., 180 F.2d 310, 312, we adopted the one-year rule under which an expenditure should be capitalized "if it brings about the acquisition of an asset having a period

of useful life in excess of one year or if it secures a like advantage to the taxpayer which has a life of more than one year." This rule was followed in United States v. Akin, 10 Cir., 248 F.2d 742, 744, cert. denied, 355 U.S. 956, 78 S.Ct. 542, 2 L.Ed. 532. In United States v. Wehrli, 10 Cir., 400 F.2d 686, 689, we said that the rule "was intended to serve as a mere guidepost for the resolution of the ultimate issue, not as an absolute rule requiring the automatic capitalization of every expenditure providing the taxpayer with a benefit enduring for a period in excess of one year."

In Commissioner of Internal Revenue v. Lincoln Savings & Loan Ass'n, 403 U.S. 345, 354, 91 S.Ct. 1893, 1899, 29 L.Ed.2d 519, a case relating to the deductibility of a premium required by law to be paid to the Federal Savings and Loan Insurance Corp., the Court said that "the presence of an ensuing benefit that may have some future aspect is not controlling; many expenses concededly deductible have prospective effect beyond the taxable year."

United States v. Mississippi Chemical Corp., 405 U.S. 298, 92 S.Ct. 908, 31 L.Ed. 2d 217, was concerned with the deductibility of expenditures for stock in one of the Banks for Cooperatives established by the Farm Credit Act of 1933. The Court said, 405 U.S. at 310, 92 S.Ct. at 915: "Since the security is of value in more than one taxable year, it is a capital asset within the meaning of § 1221 of the Internal Revenue Code, and its cost is nondeductible."

The four cases just mentioned dealt with acquisitions of, or improvements to, a distinct and recognizable property interest. Participation in the Master Charge system has no extrinsic or marketable value. It creates no property right. We take the 1-year test to be no more than a factor for consideration. We do not know how the useful life of the asset, which the government says was acquired, would be determined. The government insists that the point is immaterial because we are not concerned with amortization. Be that as it may,

the controlling question is whether taxpayer can expense, or must capitalize, the challenged items. We find no statutory, regulatory, or decisional test which is dispositive. The issue must be determined on the facts presented in the novel situation before us.

Tellier says, 383 U.S. at 689–690, 86 S.Ct. at 1120:

"The principal function of the term 'ordinary' in § 162(a) is to clarify the distinction, often difficult, between those expenses that are currently deductible and those that are in the nature of capital expenditures, which, if deductible at all, must be amortized over the useful life of the asset."

In Lincoln Savings, 403 U.S. at 354, 91 S.Ct. at 1899, the Court said:

"What is important and controlling, we feel, is that the [challenged] payment serves to create or enhance for Lincoln what is essentially a separate and distinct additional asset and that, as an inevitable consequence, the payment is capital in nature and not an expense, let alone an ordinary expense, deductible under § 162(a) in the absence of other factors not established here."

The premium payment in Lincoln flowed into the Secondary Reserve of Federal Savings and Loan Insurance Corp. The Court pointed out that the taxpayer had "a distinct and recognized property interest in the Secondary Reserve." 403 U.S. at 355, 91 S.Ct. at 1899. The start-up expenditures here challenged did not create a property interest. They produced nothing corporeal or salable. They are recurring. At the most they introduced a more efficient method of conducting an old business. The government suggests no way in which they could be amortized. The government's theoretical approach ignores the practicalities of the situation, and permits a distortion of taxpayer's financial situation. If an expenditure, concededly of temporal value, may be neither expensed nor amortized, the adoption of technological advances is discouraged.

Welch v. Helvering, 290 U.S. 111, 113–114, 54 S.Ct. 8, 9, 78 L.Ed. 212, says that "what is ordinary * * * is * * * a variable affected by time and place and circumstance." Deputy v. du Pont, 308 U.S. 488, 496, 60 S.Ct. 363, 367, 84 L.Ed. 416, says that: "It is the kind of transaction out of which the obligation arose and its normalcy in the particular business which are crucial and controlling." We are concerned with times and circumstances in which the use of bank credit cards in consumer transactions is a normal part of the banking business. The challenged expenditures were for the continuation of an existing business and for the preservation and improvement of existing income. Hence, they were ordinary expenses. See Briarcliff, 475 F.2d at 787.

We are convinced that the challenged start-up expenses were ordinary and necessary and were incurred during the tax year in carrying on the banking business of taxpayer. Accordingly, they were deductible under § 162(a).

Affirmed.